Not Intended for Print Publication

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Case No. 1:04CR00056-005 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **JAMES ROBERT ESTEP**, ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*Thomas J. Bondurant, Jr., and Jennifer R. Bockhorst, Assistant United States Attorneys, Roanoke and Abingdon, Virginia, for United States of America; Emmitt F. Yeary and Christine M. Spurell, Yeary & Associates, P.C., Abingdon, Virginia, for Defendant James Robert Estep.*

The defendant James Robert Estep has objected to the calculation of his guideline range for sentencing purposes. This opinion resolves those objections, as well as an objection made by the government.

I

In this prosecution, dubbed "Operation Big Coon Dog" by the government, sixteen defendants, including seven public officials, have been convicted of federal offenses primarily arising out of bribery and bid-rigging schemes in Buchanan

County, Virginia. As explained in the presentence investigation report ("PSR") prepared by a probation officer of this court:

> While there are several instances of corruption involved in the conduct of the defendants, the majority of the criminal conduct in this case began following the "Hurley Flood of 2002" and some minor floods which occurred in the spring of 2003. Hurley, a small community in Buchanan County, Virginia, lies within the Knox District and the supervisor during the time frame of the illegal conduct was Stuart Ray Blankenship.
>
> After a series of heavy rains on May 2, 2002, Buchanan County was seriously flooded with damages totaling approximately 50 million dollars and the loss of two lives. The hardest hit area was near Hurley in the Knox district. This damage included the destruction of houses, businesses, roads and bridges. The subsequent cleanup work involved removing flood debris from the creeks so that they would not become obstructed and flood again; to rebuild damaged roads and bridges; and to demolish any unsafe structures.
>
> Within days of the flood, the Federal Emergency Management Agency (FEMA) began working with the Virginia Department of Emergency Management (VDEM) to establish a public assistance program to reimburse Buchanan County for damages caused by the flood. The process calls for the county to initially pay the contractors and apply to VDEM for reimbursement for a particular project. If VDEM approves the project, the application is sent to FEMA for approval, if FEMA approves the project, the federal agency pays 75% of the cost to VDEM, who adds 23% of the cost and wires the funds to the county. The county is responsible for the final 2% of the cost, which was offset by a handling/management fee of 2% paid to the county. In relation to the Hurley flood its agencies submitted 71 projects totaling approximately $5 million which was approved by VDEM and FEMA. The county disbursed an additional approximate amount of $2.1 million that has not yet been reimbursed by VDEM or FEMA. Therefore, the transactions involved in the instant offenses total approximately $7.1 million.

Initially FEMA and VDEM contracted with the Army Corps of Engineers, who subcontracted with Disaster Recovery Contractors (DRC) of New Orleans for debris removal from the creeks. County officials, led by Stuart Ray Blankenship, accused DRC of padding its tonnage of debris removal by randomly digging and hauling off dirt and rocks, rather than removing destructive debris from the creeks. In addition, the county officials were upset that DRC was not hiring local contractors. By June 2002, FEMA agreed with the county, refused to pay DRC a $500,000 payment, and turned over cleanup operations to county officials. However, by the time DRC was relieved of duties on June 21, 2002, it had received payments of approximately $3.2 million.

After the county became authorized to award contracts for cleanup operations, bridge repairs, construction and demolition, FEMA approved project applications if they were "reasonable" and the process of awarding a contract "complied with state law." The county board of supervisors decided that the supervisor of each district could unilaterally award contracts in that district for emergency work and could accept low bids of three contractors/participants in non-emergency work. However, the distinction between emergency and non-emergency work was not clear. In addition, the bidding process was not open, as the supervisor could choose which three contractors were to bid on a certain project. This process opened the door to bribes and bid-rigging. Supervisor Stuart Ray Blankenship of the Knox district accepted cash, expensive coon dogs, the construction of a coon dog kennel, a dog box for his truck, a motor, motor vehicles, ATVs, clothing, food, vacations, and a firearm to influence the awarding of contracts. Supervisor James Ralph "Pete" Stiltner, Jr., of the Rock Lick district accepted cash, favorable land transactions, favorable equipment transactions, clothing and a large screen TV to entice the awarding of contracts and cover-up illegal activities. County Coal Road Engineer Kenneth Morris Hale accepted cash and assisted Stuart Ray Blankenship obtain a motor. County Emergency Coordinator David Mathias Thompson accepted cash and clothing for rendering aid in the awarding of contracts. FEMA employee Gary Ray Moore accepted cash, a firearm, NASCAR tickets, football tickets, tires and construction materials to induce FEMA to keep the flow of federal money unimpeded and to "look the other way."

-3-

Case 1:04-cr-00056-JPJ   Document 556   Filed 10/20/05   Page 3 of 15   Pageid#: 2082

County Road Inspector Ricky Allen Adkins was allowed to submit falsified expense and time records because he fed the coon dogs and cleaned out the kennels belonging to Stuart Ray Blankenship, as well as mowing his lawn and bringing him lunch. The remaining defendants are the contractors who paid the bribes and rigged the bids. The specific details are as follows.

. . . .

In the summer of 2002, Hale approached Stephens and requested that a $4,000 debt at Vansant Lumber be eliminated in return to receive a contract to construct a bridge. Stephens forgave the debt. After completion of the bridge, Stephens gave Hale $1,000 in hopes of receiving additional bridge work. In June 2002, after the county took over awarding the flood contracts, it was decided to bid out six separate geographic sites in the Knox district for cleanup operations: four of the sites being locations where debris from the flood needed to be removed; one site where all the material and debris would be brought and sorted, and one site designated for dumping. Stuart Ray Blankenship did not advertise for bids and personally chose the contractors he allowed to bid on these sites: Donald Ray Matney of D&R Contractors; Earl Jackson "Roho" Lester, Jr., of Leet Construction Company; Kenneth Joseph Stephens of KJ Stephens and Associates; and Terry Gene Clevinger of Terry's Construction Company.

Blankenship told Stephens to meet with Clevinger to arrange bids, and told Matney that "you boys ought to get together and divide this up."

The four contractors, acting in concert, agreed that Matney was to receive three of the sites, Stephens was to receive two of the sites, and Clevinger was to get the contract for the reduction site. Terry Clevinger testified that Joe Stephens even filled out the bids submitted by Earl Lester and him. Lester's payoff for submitting high bids was to work as a subcontractor for Matney. When the bids were delivered and opened on July 18, 2002, Matney won the bids on all the cleanup sites and the dump site, and Clevinger won the bid on the reduction site. However, since Matney was the only one to bid on two of the cleanup sites (Sites

3 & 4), Blankenship declared those two bids to be invalid and opened them for rebid a day later. A perfect example of the corruption of the offense is reflected in these bids. The original bids for sites 3 and 4 were $177,780 and $219,016, respectively. However, the bids submitted by Earl Lester, Terry Clevinger and Joe Stephens the very next day were substantially higher than the bids submitted by Matney the previous day. The low bids, submitted by Joe Stephens, were in the amounts of $204,960 (site 3) and $253,333 (site 4). The bids submitted by Lester and Clevinger were higher, as agreed by the parties. The accepted bids on these sites were as follows: cleanup site #1 was awarded to Matney in the amount of $124,767; cleanup site #2 was awarded to Matney in the amount of $140,280; cleanup site #3 was awarded to Stephens in the amount of $204,960; cleanup site #4 was awarded to Stephens in the amount of $252,333; the dumping site was awarded to Matney in the amount of $279,540; and the reduction site was awarded to Clevinger in the amount of $288,674.

All of the bids were based on an estimated amount of tonnage for each site. If the tonnage increased, the actual payment on each contract would increase accordingly. The tonnage was fraudulently increased by the removal of non-debris matter (e.g. rocks and dirt). The actual payments made on these contracts are as follows: cleanup site #1, $177,531.40; cleanup site #2, $290,500.80; cleanup site #3, $254,477.98; cleanup site #4, $1,460,129.03; dump site, $288,851.30; and reduction site, $765,228.46. As a result, the original six contracts totaling $1,291,554, were actually paid out in the amount $3,236,718.97.

(PSR §§ 84-88, 91-94.)

At the time of Estep's guilty plea, the prosecutor represented further facts as follows:

Terry Clevinger would testify that in July, 2002 that Ray Blankenship came to Terry Clevinger and told him to hook up with Jamie Estep to bid on the reduction site.

-5-

Clevinger and Estep rode together to the, where the bid process took place, and it was detailed in the August 13th factual summary. Clevinger got the reduction site after engaging in bid rigging of Joe Stephens, Donald Matney and Earl Lester.

It was agreed between Estep and Terry Clevinger that Estep would be a silent partner in the reduction site; that Estep would oversee the operations at the site while Terry Clevinger was off building bridges after the Hurley flood. Estep and Clevinger agreed to share profits after the expenses were paid, but never came up with the precise split, what those split in profits would be.

However, Estep did at least receive $200,000 from the reduction site work in the form of a $100,000 check issued October 23, 2002, and another $100,000 check issued February 20, 2003.

In September, 2002, Ray Blankenship came to Terry Clevinger and demanded that Terry Clevinger purchase him an ATV as a reward for getting the reduction site work for both Terry Clevinger and this defendant, Estep.

Terry Clevinger declined to buy the ATV at that time. Ray Blankenship got mad and shut down the site. At some point after that Kenny Hale, the county engineer, came to Terry Clevinger and told Terry to go ahead and buy Ray Blankenship the ATV or he wouldn't get any more reduction site work.

Clevinger then went to Mr. Estep with this problem, and they agreed to go in halves and buy the ATV for Ray Blankenship, so Ray Blankenship got his toy and the work resumed at the reduction site.

From this point on it was agreed between Estep and Terry Clevinger to split the cost of the reduction site, part of the costs being the bribes paid to Ray Blankenship.

-6-

This defendant was awarded Social Security disability benefits November, 1987, has continued to receive them in the amount of around $1,355 a month.

In 1987, as part of receiving the benefits, he was advised he had to report any work that he was engaged in to the Social Security Administration. He was periodically reminded of this reporting requirement thereafter. He was specifically reminded of it in two specific letters sent to him after review of his file, one being in April of 1997, the other being in the year of June, 2000.

There's evidence Estep was well aware of this reporting requirement, because in late 1990s he actually reported that he did some work and received some compensation for the Virginia Board of Elections for serving on that Virginia Board of Elections for a two year period.

If the case went to trial the Government would have several people come in and testify he was an active owner and operator of Junction Hardware since at least 1994, and then in an interview with federal agents during the course of this investigation he admitted that he kept Junction Hardware in his wife's name because of his Social Security benefits.

Of course, the crime here is charged he did not report his work, but the Government would also be able to show since at least 1994 that he did make money at Junction Hardware.

(Guilty Plea Tr. 20-23.)[1]

---

[1] In his latest brief, the defendant argues that this proffer of evidence by the government should not be considered by the court in determining his objections because it was never agreed to by the defendant. (Reply to Government's Resp. 2-3.) However, after the government's proffer, I asked the defendant if he contested or disputed any of it. (Guilty Plea Tr. 24.) His rambling responses were largely nonspecific and ended with the following comment:

-7-

A multicount Indictment was returned against the defendants on June 23, 2004. On November 17, 2004, defendant Estep pleaded guilty to Count Forty-Two, charging him with Social Security fraud, 42 U.S.C.A. § 408(a)(4) (West Supp. 2005), as well as Count One of an Information, charging conspiracy to commit wire fraud, 18 U.S.C.A. § 371 (West 2000) and Count Two of the Information, charging conspiracy to commit money laundering, 18 U.S.C.A. § 1956(h) (West Supp. 2005). The court accepted the defendant's plea and directed the preparation of a PSR. The probation officer has determined that the defendant's offense level should be calculated pursuant to United States Sentencing Guidelines Manual ("USSG") §

---

THE DEFENDANT: Yes, sir. I understand. Like I said, what the man has got wrote down there, that's six of one, half a dozen of the other. Most of the stuff Terry did on his own. Was I aware he was doing it, before or after, he did what he wanted to do and then he'd come around and talk about it. But as far as being me saying, you know, I plead guilty to it.

(Guilty Plea Tr. 32.) Under these circumstances, I consider the government's proffer sufficiently reliable to credit it. *See* USSG § 6A1.3(a) (2004) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy."); *United States v. Robinson*, 101 Fed. Appx. 389, 393 (4th Cir.) (unpublished) ("[A] district court may consider a proper (unchallenged) proffer as relevant information in making a sentencing decision."), *cert. denied*, 125 S. Ct. 312 (2004). Moreover, it would be patently unfair to allow the defendant to raise this objection in its reply brief, when it did not object to the reliability of the factual basis of the government's argument in the two prior hearings held on the defendant's objections. In should be noted that the defendant did not testify at either hearing, or offer any evidence other than a fee schedule showing the hourly rate of emergency responders. (Sept. 14, 2005 Tr. 17-18; Def.s Ex. 1.)

2S1.1(a)(2) (2004), relating to money laundering, and using the total value of the laundered funds of more than $400,000 million but less than $1 million. Calculated thus, the defendant's Base Offense Level is 22, together with a two-level enhancement because of his conviction under 18 U.S.C.A. § 1956. *See* USSG § 2S1.1(b)(2)(B) (2004). The final PSR has applied a two-level upward adjustment for the defendant's role in the offense, USSG § 3B1.1(c) (2004),[2] and a three-level reduction for acceptance of responsibility, USSG §§ 3E1.1 (2004). The defendant's proposed Total Offense Level is thus 23.

Both the government and the defendant objected to the guideline calculation and the court fixed a hearing on any objections for July 7, 2005, with the actual sentencing to be held later. At this hearing, I overruled the government's objection and held that the defendant was entitled to a reduction for acceptance of responsibility. I partially granted the defendant's objection to the probation officer's proposed three-level enhancement for role in the offense and held that only a two-level enhancement should be applied. I denied the defendant's remaining objections.

---

[2] The probation officer had initially recommended a three-level enhancement for role in the offense. As noted below, at the earlier hearing on objections I determined that a two-level enhancement was appropriate and thereafter the probation officer submitted a revised PSR that used the two-level increase in the guideline calculation.

-9-

The defendant's sentencing was scheduled for September 14, 2005. On September 13, the defendant filed a Memorandum in Aid of Sentencing, prepared by a new attorney in the case, which memorandum sought to reargue objections to the guideline calculation. At the hearing the next day, the government objected to reopening these objections. However, I allowed the new argument and took the issues under advisement. Following the hearing, I entered an order allowing the government to file a response to the defendant's objections no later than September 26, 2005, and to submit by that date any new objections or arguments which it might have on the issues. I later extended the government's response date to September 30, 2005. I also allowed the defendant to reply to the government's submissions within seven days of service.

The government timely filed its response. The defendant filed a reply on October 14, 2005, three days late.

II

In *United States v. Booker,* 125 S.Ct. 738, 767 (2005), the Supreme Court held that the Sentencing Guidelines are not mandatory, although a sentencing court is still obligated to "consult those Guidelines and take them into account," along with the sentencing factors set forth in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2005).

After *Booker*, the sentencing court must "first calculate (after making appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (citations omitted). Accordingly, I must determine any objections to the application of the Sentencing Guidelines.

A

The defendant objects to a two-level enhancement for his role in the offense, pursuant to USSG § 3B1.1(c).

Multiple participants in the same criminal conduct may be found to have the same or different levels of culpability depending on the circumstances of the case. The Sentencing Guidelines take this into account by permitting adjustments for role in the offense. Under all of the circumstances of this case, I find that the defendant should receive a two-level enhancement under § 3B1.1(c). As shown by the facts recited above, which I adopt, the defendant was clearly an organizer of the criminal activity in question, but his role was limited.

In support of his position, the defendant cites *United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997), in which the court held that a defendant was not subject to a role enhancement under the Sentencing Guidelines simply because he had a

supervisory job, where his supervisory status was not connected to the criminal conduct. In the present case, however, Estep's management of the reduction site was connected to both the bribery scheme and the scheme to hide his earnings from Social Security. *See United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (holding that district court erred when it failed to apply role enhancement to owner of car dealership that was locus for money laundering scheme where defendant was active participant in scheme).

B

The defendant objects to the amount of funds used under USSG § 2S1.1(a)(2) to calculate his offense level.

In order to calculate the proper offense level, the court must first look to the money laundering guideline, USSG § 2S1.1 (2004). That guideline offers two successive alternatives in order to determine the Base Offense Level: (1) the offense level for the underlying offense from which the laundered funds were derived if the offense level for that offense can be determined; or otherwise (2) eight levels plus the number of offense levels from the theft, property destruction, and fraud table corresponding to the laundered funds. USSG § 2S1.1(a). The commentary to this guideline provides that alternative (2) applies to any case in which "the offense level

-12-

for the underlying offense is impossible or impracticable to determine." USSG § 2S1.1 cmt. n.3(A).

The underlying offenses for the defendant's money laundering conduct are bribery and wire fraud. The guidelines for both offenses require a determination of the loss to the government from the defendant's conduct. *See* USSG §§ 2B1.1(b) (2004), 2C1.1(b)(2) (2002). As shown by the evidence in this case, the loss to the government cannot practically be determined. The bribery of those who authorized the work permitted the cost of the work to be essentially economically unregulated. Because of the nature of most of the work, it is now impracticable, if not impossible, to determine in hindsight what the work would have cost the government had the illegal and fraudulent bids not been accepted. There is evidence that the costs were excessive, but no realistic way to even estimate the excess.

The defendant argues that at most the amount attributable to him should be $200,000, the amount paid to him for the reduction site, less $87,500, which the defendant contends represents the fair market value of the work performed by him on that site.[3]

---

[3] The defendant contends that his services would have cost at least $75 per hour and that he worked "about 10 hours a day over a period of several months." (Def.'s Mem. in Aid of Sentencing 4.)

-13-

I disagree. The facts clearly show that the defendant was directly involved in the larger scheme to bribe a public official in connection with the entire reduction site contract, for which there was paid the sum of $765,228.46. Thus, I find that the probation officer's calculation was correct.

C

The government objects to the defendant receiving any reduction for acceptance of responsibility pursuant to USSG § 3E1.1. The government contends that Estep's statements at the time of his guilty plea, as well as his attorneys' arguments in connection with sentencing, are "inconsistent with a demonstration of acceptance of responsibility." (Resp. to Def. Estep's Sentencing Mem. 4-5.)

While I agree that Estep's acceptance of responsibility is not a model for defendants to follow, I find that it passes at least minimal muster. *See* USSG § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.").[4]

---

[4] Congress directly amended § 3E1.1 effective April 30, 2003, to provide that the third level of reduction for acceptance of responsibility could only be given on the motion of the government. *See* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, § 401(g), 117 Stat. 650, 671 (2003). Since this amendment occurred after the date of at least a portion of the defendant's criminal conduct, I will not consider that it applies. *But see United States v. Calloway*, 108 Fed. Appx. 810, 812-13 (4th Cir. 2004) (unpublished) (holding that Ex Post Facto Clause not violated by applying PROTECT Act amendment to prior offense), *vacated on rehearing on other grounds*, 122 Fed. Appx. 665 (4th Cir. 2005).

III

For these reasons, it is **ORDERED** that the objections to the PSR are DENIED and the PSR, as revised July 12, 2005, including the guideline calculation contained therein, is adopted as the finding of the court.[5] The defendant has a Total Offense Level of 23, with a Criminal History Category of I, for a custody range of 46 to 57 months, supervised release of two to three years, and a fine range of $10,000 to $500,000.

ENTER: October 20, 2005

/s/ JAMES P. JONES
Chief United States District Judge

---

[5] To the extent not discussed in this Opinion, I deny any other objections for the reasons stated on the record on July 7, 2005.

-15-